Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck, NY 11021-3104
Telephone: (516) 268-7080
spencer@spencersheehan.com

United States District Court
Eastern District of New York

1:20-cv-05125

Stephen Bradshaw, individually and on behalf of all others similarly situated,

     Plaintiff,

- against -

Blue Diamond Growers,

     Defendant

Complaint

   Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

   1. Blue Diamond Growers ("defendant") manufactures, distributes, markets, labels and sells blends of almond milk and coconut milk under the Almond Breeze brand purporting to be flavored only with vanilla ("Product").

   2. The Product is available to consumers from retail and online stores of third-parties and is sold in cartons of 32 OZ and 64 OZ.

   3. The relevant front label representations include "Unsweetened," "Vanilla," "Almond Breeze," "Almond Coconut Blend," "almondmilk coconutmilk blend" and pictures of almonds and coconuts.[1]

---

[1] The original complaint included a different version of the product label. The version included here is the label relied on by Plaintiffs.



4. The representation as "Vanilla" is false, deceptive and misleading because the Product contains fake, artificial vanilla which provides the vanilla taste, and the amount of real vanilla, if any, is trace or *de minimis*.

5. Vanilla (*Vanilla planifolia Andrews* and *Vanilla tahitenis Moore*) comes from an orchid plant that originated in Mexico where it was first cultivated.

6. The vanilla orchid produces a fruit pod, the vanilla bean, which is the raw material for true vanilla flavorings.

7. The vanilla bean is not consumed by itself – it is heated in the sun for weeks until being soaked in alcohol solution and its flavor constituents extracted (vanilla extract).

8. An example of the compounds which provide vanilla's flavor are shown below in a sample of vanilla extract.

| MS Scan # | Area Integration | Peak Assignment | Peak Area % |
|---|---|---|---|
| 67 | 16132 | hexanal | 0.0206 |
| 71 | 16235 | butanediol isomer | 0.0207 |
| 81 | 57370 | butanediol isomer | 0.0732 |
| 103 | 36387 | 3-methylbutyric acid | 0.0464 |
| 115 | 33053 | furfural | 0.0422 |
| 141 | 27408 | butanal, diethyl acetal | 0.0350 |
| 262 | 18390 | 3-methylbutanal, diethyl acetal | 0.0235 |
| 281 | 25224 | hexanoic acid | 0.0322 |
| 289 | 2729 | methyl furfural | 0.0035 |
| 299 | 52183 | phenol + trace of benzaldehyde | 0.0665 |
| 349 | 2385 | 1H-pyrrole-2-carboxaldehyde | 0.0030 |
| 379 | 47287 | limonene + benzyl alcohol | 0.0603 |
| 397 | 13835 | heptanoic acid | 0.0176 |
| 409 | 31102 | gamma-hexalactone | 0.0397 |
| 415 | 19338 | p-cresol | 0.0247 |
| 425 | 4470 | hexanal, diethyl acetal | 0.0057 |
| 443 | 287479 | guiaicol | 0.3666 |
| 453 | 5947 | nonanal | 0.0076 |
| 477 | 10000 | phenylethyl alcohol | 0.0128 |
| 496 | 112067 | ? | 0.1429 |
| 505 | 44668 | benzoic acid + octanoic acid | 0.0570 |
| 522 | 4551 | diethyl succinate | 0.0058 |
| 536 | 2461 | ethyl benzoate | 0.0031 |
| 544 | 11769 | 1,2-benzenediol | 0.0150 |
| 555 | 145356 | 2-methoxy-4-methylphenol | 0.1854 |
| 567 | 2537 | methyl salicylate | 0.0032 |
| 587 | 8552 | hydroxy methyl furfural (HMF) | 0.0109 |
| 594 | 5555 | benzeneacetic acid | 0.0071 |
| 605 | 101562 | nonanoic acid | 0.1295 |
| 624 | 6802 | hydroquinone | 0.0087 |
| 631 | 3864 | 4-methoxybenzaldehyde (p-anisaldehyde) | 0.0049 |
| 642 | 6356 | ethyl nonanoate | 0.0081 |
| 653 | 53264 | 4-methoxybenzyl alcohol (p-anisyl alcohol) | 0.0679 |
| 676 | 14481 | cinnamyl alcohol | 0.0185 |
| 685 | 16094 | 3-hydroxybenzyl alcohol | 0.0205 |
| 718 | 12188570 | 3-hydroxybenzaldehyde + 4-ethoxymethylphenol | 15.5440 |
| 751 | 122634 | methyl cinnamte | 0.1564 |
| 759 | 60715743 | vanillin | 77.4301 |
| 796 | 90669 | methyl-p-methoxybenzoate (methyl paraben) | 0.1156 |
| 809 | 2228588 | vanillyl ethyl ether + trace of 4-hydroxy-3-methoxybenzyl alcohol | 2.8421 |
| 832 | 224829 | p-hydroxybenzoic acid | 0.2867 |
| 839 | 37335 | acetovanillone | 0.0476 |
| 892 | 950342 | vanillic acid | 1.2120 |
| 909 | 405589 | 3,4-dihydroxybenzaldehyde | 0.5172 |
| 935 | 82429 | 3,4-dihydroxy-5-methoxybenzaldehyde | 0.1051 |
| 954 | 6212 | ethyl homovanillate | 0.0079 |
| 975 | 78148 | syringealdehyde | 0.0997 |
| 1266 | 14130 | ethyl palmitate | 0.0180 |
| 1518 | 21477 | ethyl linoleate | 0.0274 |
| | 78413588 | Total | 100.0000 |

3

9. While the main flavor compound of vanilla is vanillin (MS Scan # 759, 77.4301 Peak Area %), vanilla's unique flavor is due to over 200 compounds scientists have identified, including volatile constituents such as acids, ethers, alcohols, acetals, heterocyclics, phenolics, hydrocarbons, esters and carbonyls.

10. Methyl cinnamate (MS Scan # 751) and p-cresol (MS Scan # 415) provide cinnamon and creamy flavor notes to vanilla.

11. Other compounds present in relatively significant amounts include acetovanillone, cinnamyl alcohol, guiaicol, p-cresol, p-hydroxybenzoic acid (MS Scan # 832, 0.2867), vanillic acid (MS Scan # 892, 1.2120) and vanillyl ethyl ether.

12. The popularity of vanilla in the 19th century led to the isolation of the vanillin molecule from vanilla, which became the first artificial flavor.

13. This availability of low-cost vanillin resulted in companies adulterating foods purporting to contain vanilla, by either including no vanilla or a trace or *de minimis* amount, boosted by added synthetic vanillin.

14. However, vanillin separated from the rest of the vanilla bean it lacked the other components of vanilla's flavor.

15. Consumer and industry groups have long sought to prevent this deception.

16. The earliest efforts to prevent fraud in vanilla products was the U.S. Pharmacopeia standard, which required a specific weight of vanilla beans as the source for vanilla extract.

17. The focus was on the weight of actual vanilla beans, because this would prevent companies from adding vanillin to a small amount of vanilla beans.

18. Consumer deception continued into the 20th century, with government entities regularly penalizing companies that deceived consumers by labeled their products and foods as

"vanilla" but were little more than vanillin with caramel coloring.

19. Congress took note of this consumer deception, and directed the Food and Drug Administration ("FDA") to establish standards to prevent the marketing of foods from which traditional constituents were removed and new or different (often cheaper and artificial) ingredients were substituted.

20. Vanilla was one of these foods, and regulations were enacted which prevented vanillin from being added to vanilla without disclosing this fact to consumers.

21. For over fifty (50) years, companies' adherence to labeling foods containing vanillin as artificially flavored gave consumers confidence to trust what was on a label.

22. When a food was labeled as "vanilla" without qualification, it was understood by consumers that the flavoring was only from the ingredient of vanilla beans.

23. These regulations effectively established custom and practice in the so that consumers' experience has primed them to infer from a product's labeling whether the flavor source is entirely from the characterizing vanilla bean ingredient or not.

24. In early 2018, in response to reports of a surge in fraudulent vanilla flavored foods, the flavor industry – The Flavor and Extract Manufacturers Association of the United States or "FEMA" – urged companies to return to truthfully labeling vanilla foods so consumers would not be misled by artificial vanilla flavors where foods were labeled only with "vanilla." *See* John B. Hallagan and Joanna Drake, FEMA, "Labeling Vanilla Flavorings and Vanilla-Flavored Foods in the U.S.," Perfumer & Flavorist, Vol. 43 at p. 46, Apr. 25, 2018 ("Hallagan & Drake").[2]

25. Based on the term "Vanilla" and the absence of any qualifying terms, reasonable

---

[2] Hallagan and Drake, "There are many current examples of food products that are labeled as 'vanilla' that are clearly mislabeled and therefore in violation of FDA regulations." FEMA's *cri de coeur* was not completely magnanimous. It presently enjoys a special relationship with the FDA whereby its committee is responsible for certifying new food ingredients are safe for consumption. If companies flout the regulations, FEMA's status would be undermined.

5

consumers, and Plaintiffs, expect(ed) the Product's vanilla taste to be only from vanilla beans.

26. In a nationwide survey of over four hundred people of various educational, ethnic and socio-economic backgrounds, over sixty-six (66) percent understood the Product's "Vanilla" statement to mean the vanilla taste came from vanilla beans from the vanilla plant while twenty-eight (28) percent expected the vanilla taste was from non-vanilla sources.

27. Of the sample surveyed, approximately fifty-six (56) percent indicated they would be less likely to purchase the Product if they knew the vanilla taste came from artificial vanilla flavors.

28. Though the Product's front label only references "Vanilla," the ingredient list does not clarify and disclose to consumers that its vanilla taste comes predominantly from non-vanilla sources, since the flavoring is declared as "Natural Flavors."

INGREDIENTS: ALMONDMILK (FILTERED WATER, ALMONDS), COCONUTMILK (FILTERED WATER, COCONUT CREAM), CALCIUM CARBONATE, NATURAL FLAVORS, POTASSIUM CITRATE, SEA SALT, SUNFLOWER LECITHIN, GELLAN GUM, VITAMIN A PALMITATE, VITAMIN D2, D-ALPHA-TOCOPHEROL (NATURAL VITAMIN E).

29. That the "Natural Flavors" contains added vanillin is demonstrated through GC-MS analysis, a method of targeted and non-targeted detection which can identify the range of volatile compounds responsible for vanilla's flavor with minimal to no degradation.

30. The benefit of such an approach is the focus on signals generated and comparison with a known authentic sample.

| MS Scan # | Area Integration | Peak Assignment | Conc. PPM w/w |
|---|---|---|---|
| 100 | 54739 | formic acid | 0.014 |
| 138 | 155343 | acetic acid | 0.039 |
| 208 | 179712 | acetol | 0.045 |
| 215 | 19321 | propanoic acid | 0.005 |
| 253 | 110306 | acetoin | 0.028 |
| 281 | 301046 | 1,2-propylene glycol | 0.076 |
| 313 | 14350 | butyric acid | 0.004 |
| 330 | 23498 | 1,3-butanediol | 0.006 |
| 338 | 72387 | hexanal | 0.018 |
| 378 | 34688 | methyl pyrazine | 0.009 |
| 384 | 24576 | furfural | 0.006 |
| 414 | 66189 | furfuryl alcohol | 0.017 |
| 427 | 25818 | pentanoic acid | 0.007 |
| 470 | 12102 | heptanal | 0.003 |
| 492 | 80103 | 2,5-dimethylpyrazine | 0.020 |
| 541 | 311750 | hexanoic acid | 0.079 |
| 549 | 16426 | methyl furfural | 0.004 |
| 558 | 140563 | benzaldehyde | 0.035 |
| 569 | 36299 | 6-methyl-5-hepten-2-one | 0.009 |
| 578 | 15551 | 2-pentylfuran | 0.004 |
| 592 | 23802 | octanal | 0.006 |
| 599 | 42217 | trimethylpyrazine | 0.011 |
| 605 | 12512 | 1H-pyrrole-2-carboxaldehyde | 0.003 |
| 625 | 37005 | cyclotene | 0.009 |
| 637 | 42556 | benzyl alcohol | 0.011 |
| 657 | 96229 | heptanoic acid | 0.024 |
| 660 | 127596 | 2-acetyl pyrrole | 0.032 |
| 675 | 148305 | tetramethylpyrazine | 0.037 |
| 695 | 39158 | guiaicol | 0.010 |
| 704 | 112417 | nonanal | 0.028 |
| 726 | 15725391 | maltol | 3.971 |
| 757 | 613569 | octanoic acid + benzoic acid | 0.155 |
| 809 | 62481 | decanal | 0.016 |
| 820 | 3960472 | naphthalene-d8 (internal standard) | 1.000 |
| 829 | 174273 | hydroxymethyl furfural (HMF) | 0.044 |
| 852 | 369429 | nonanoic acid | 0.093 |
| 869 | 271802 | gamma-octalactone | 0.069 |
| 893 | 42902 | delta-octalactone | 0.011 |
| 900 | 99937 | 2,4-decadienal | 0.025 |
| 923 | 239566 | 2,4-decadienal | 0.060 |
| 946 | 391210 | decanoic acid | 0.099 |
| 968 | 674802 | gamma-nonalactone | 0.170 |
| 986 | 43483 | delta-nonalactone | 0.011 |
| 1019 | 63016900 | vanillin | 15.911 |
| 1035 | 18427 | geranyl acetone | 0.005 |
| 1062 | 478409 | gamma-decalactone | 0.121 |
| 1082 | 10391 | acetovanillone | 0.003 |
| 1086 | 19537 | delta-decalactone | 0.005 |
| 1117 | 1805139 | lauric acid | 0.456 |
| 1145 | 35452 | ethyl laurate | 0.009 |
| 1276 | 79118 | myristic acid | 0.020 |
| 1434 | 91441 | methyl palmitate | 0.023 |
| 1467 | 302497 | vanillin glyceryl acetal | 0.076 |
| 1486 | 171521 | vanillin glyceryl acetal | 0.043 |
| 1499 | 194697 | vanillin glyceryl acetal | 0.049 |
| 1656 | 205663 | methyl linoleate | 0.052 |
| 1663 | 312939 | methyl oleate | 0.079 |
| 1695 | 29580 | methyl stearate | 0.007 |
|  | 87857120 | **Total (excluding internal standard)** | **22.183** |

31. The results show the Product contains an abnormal excess of vanillin (MS Scan # 1019, 15.911 PPM) relative to the profile of minor components in a vanilla preparation, which is a strong indicator it contains vanillin from non-vanilla sources.

32. When vanillin is present from vanilla beans, it will be accompanied by other compounds present in vanilla in small amounts, such as p-hydroxybenzoic acid and vanillic acid.

33. The above sample of vanilla extract reveals that the ratio of vanillin to p-hydroxybenzoic acid is 270 (vanillin, MS Scan # 759, 77.4301 divided by p-hydroxybenzoic acid, MS Scan # 832, 0.2867) and vanillin to vanillic acid is 64 (vanillin, MS Scan # 759, 77.4301 divided by vanillic acid, MS Scan # 892, 1.2120).

34. Assuming that all vanillin in the Product came from vanilla beans, it would be expected to contain p-hydroxybenzoic acid at 0.059 PPM and vanillic acid at 0.249 PPM, based on their relative amounts in the vanilla extract sample.

35. The failure to detect p-hydroxybenzoic acid and vanillic acid, despite these compounds being analyzed for, means that the Product contains a trace or *de minimis* real vanilla and added vanillin.

36. The representation of "vanilla" is misleading because consumers expect to be told the Product is flavored with vanillin through a label statement of "artificially flavored."

37. Because the Product is characterized as "vanilla" and "contains vanillin derived from a non vanilla bean source," it should be labeled as "artificially flavored." FDA Letter, Margaret-Hanna Emerick, FDA, to Richard Brownell, February 25, 2016; *See* 21 C.F.R.101.22(i)(2).

38. By omitting "artificial flavor" or "artificially flavored" from the front label, consumers are not told that the Product's taste is from artificial vanilla flavors.

39. Consumers who read the ingredient list will expect that the "Natural Flavors" are

other natural vanilla flavors instead of artificial vanilla flavors and are misled to believe that the Product contains more vanilla than it does.

40. Consumers are entitled to know "whether the product [they are buying] is flavored with a vanilla flavoring derived from vanilla beans, in whole or in part, or whether the food's vanilla flavor is provided by flavorings not derived from vanilla beans."[3]

41. Plaintiff reasonably believed that the "vanilla" representation on the front label of the Product meant that the Product was flavored only from the characterizing ingredient of vanilla beans and did not contain added vanillin, because this information is required to be disclosed, *viz*, by stating "artificially flavored."

42. Defendant knows consumers will pay more for the Product because the front label only states "vanilla" and not "artificially flavored."

43. Defendant's omission and failure to disclose artificial vanilla flavor on the front label is deceptive and misleading to consumers.

44. Defendant's branding and packaging of the Product is designed to – and does – deceive, mislead, and defraud plaintiff and consumers.

45. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

46. The value of the Product that plaintiff purchased and consumed was materially less than its value as represented by defendant.

47. Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for them.

48. As a result of the false and misleading labeling, the Product is an sold at a premium

---

[3] Id.

price, approximately no less than $3.59 per 32 OZ, excluding tax, compared to other similar products represented in a non-misleading way, and higher than the price of the Product if it were represented in a non-misleading way.

### Jurisdiction and Venue

49. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2)

50. Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

51. Plaintiff Stephen Bradshaw is a citizen of New York.

52. Defendant Blue Diamond Growers, is a California corporation with a principal place of business in Sacramento, Sacramento County, California and is a citizen of California.

53. "Minimal diversity" exists because plaintiff Stephen Bradshaw and defendant are citizens of different states.

54. Upon information and belief, sales of the Product in New York exceed $5 million per year, exclusive of interest and costs, and the aggregate amount in controversy exceeds $5 million per year.

55. Venue is proper in this judicial district because a substantial part of the events or omissions giving rise to the claim occurred in this District, *viz*, the decision of plaintiff to purchase the Product and the misleading representations and/or their recognition as such.

56. This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

Parties

57. Plaintiff Stephen Bradshaw is a citizen of New York, Staten Island, Richmond County.

58. Defendant Blue Diamond Growers is a California corporation with a principal place of business in Sacramento, California, Sacramento County and is a citizen of California.

59. During the relevant statutes of limitations for each cause of action alleged, plaintiff purchased the Product within his district and/or State for personal and household consumption and/or use in reliance on the representations of the Product.

60. Plaintiff Stephen Bradshaw purchased the Product on numerous occasions during 2019, including several times during the spring and summer of 2019, at stores including ShopRite, 985 Richmond Ave, Staten Island, NY 10314.

61. Plaintiff bought the Product at or exceeding the above-referenced price because he liked the product for its intended use and relied upon the front label claims, expected the vanilla taste to come exclusively and/or predominantly from vanilla beans and did not expect its vanilla taste to be provided by artificial vanilla flavors.

62. Plaintiff was deceived by and relied upon the Product's deceptive labeling.

63. Plaintiff would not have purchased the Product in the absence of Defendant's misrepresentations and omissions.

64. The Product was worth less than what Plaintiff paid for it and he would not have paid as much absent Defendant's false and misleading statements and omissions.

65. Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance that Product's labels are consistent with the Product's components.

Class Allegations

66. The class will consist of all purchasers of the Product who reside in New York during the applicable statutes of limitations.

67. Plaintiff seek class-wide injunctive relief based on Rule 23(b) in addition to a monetary relief class.

68. Common questions of law or fact predominate and include whether defendant's representations were and are misleading and if plaintiff and class members are entitled to damages.

69. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

70. Plaintiff is an adequate representatives because his interests do not conflict with other members.

71. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

72. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

73. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

74. Plaintiff seeks class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350
(Consumer Protection Statute)

75. Plaintiff incorporates by reference all preceding paragraphs.

76. Plaintiff and class members desired to purchase and consume products which were as described and marketed by defendant and expected by reasonable consumers, given the product type.

77. Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

78. Defendant misrepresented the substantive, quantitative, qualitative, compositional and/or organoleptic attributes of the Product.

79. The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect artificial vanilla because it was not stated on the front label or ingredient list, where consumers are accustomed to looking and seeing this information.

80. Plaintiff relied on the statements, omissions and representations of defendant, and defendant knew or should have known the falsity of same.

81. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Negligent Misrepresentation

82. Plaintiff incorporates by reference all preceding paragraphs.

83. Defendant misrepresented the substantive, quantitative, qualitative, compositional and/or organoleptic attributes of the Product.

84. The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect artificial vanilla because it was not stated on the front label or ingredient list, where consumers are accustomed to looking and seeing this information.

85. Defendant had a duty to disclose the non-vanilla, artificial flavors and/or provide non-deceptive marketing of the Product and knew or should have known same were false or misleading.

86. This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product type.

87. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a well-known and respected brand or entity in this sector.

88. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Product.

89. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

90. Plaintiff incorporates by reference all preceding paragraphs.

91. The Product was manufactured, labeled and sold by defendant or at its express directions and instructions, and warranted to plaintiff and class members that they possessed substantive, quality, organoleptic, and/or compositional attributes it did not.

92. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

93. The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect artificial vanilla because it was not stated on the front label or ingredient list, where consumers are accustomed to looking and seeing this information.

94. This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

95. Plaintiff provided or will provide notice to defendant, its agents, representatives,

retailers and their employees.

96. Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years regarding the Product, of the type described here.

97. The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable.

98. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

99. Plaintiff incorporates by reference all preceding paragraphs.

100. Defendant misrepresented the substantive, quality, compositional and/or organoleptic attributes of the Product.

101. The amount and proportion of the characterizing component, vanilla, has a material bearing on price and consumer acceptance of the Product and consumers do not expect artificial vanilla because it was not stated on the front label or ingredient list, where consumers are accustomed to looking and seeing this information.

102. Defendant's fraudulent intent is evinced by its failure to accurately identify the Product on the front label and ingredient list, when it knew its statements were neither true nor accurate and misled consumers.

103. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Unjust Enrichment</u>

104. Plaintiff incorporates by reference all preceding paragraphs.

105. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   October 25, 2020

                                                                Respectfully submitted,

                                                                 Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
60 Cuttermill Rd Ste 409

Great Neck NY 11021-3104<br>
Tel: (516) 268-7080<br>
Fax: (516) 234-7800<br>
*spencer@spencersheehan.com*<br>
E.D.N.Y. # SS-8533<br>
S.D.N.Y. # SS-2056

1:20-cv-05125
United States District Court
Eastern District of New York

Stephen Bradshaw, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Blue Diamond Growers,

Defendant

Complaint

Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 409
Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: October 25, 2020

/s/ Spencer Sheehan
Spencer Sheehan